

1  DENISE FULEIHAN
   209 Royal Aberdeen Way
2  Las Vegas, NV 89144

3  702-400-0910

4  Plaintiff in Pro Per

5

6

7

8              **UNITED STATES DISTRICT COURT**

9                   **DISTRICT OF NEVADA**

10

11

12  DENISE FULEIHAN, an                )
                                       )
13  INDIVIDUAL,                        )       CASE NO. 2:09-cv-01877-RCI-PAL
                                       )
14       Plaintiff,                    )       MOTION TO VACATE RULING
                                       )       DATED SEPTEMBER 15, 2010
15                                     )       DECLARATION AND
                                       )       POINTS AND AUTHORITIES
16                                     )       IN SUPPORT
                                       )       FRCP 60(b)
17                                     )
                                       )
18       vs.                           )       DATE:
                                       )       TIME:
19                                     )       COURTROOM:
                                       )
20  WELLS FARGO dba AMERICA'S          )
    SERVICING COMPANY, a foreign       )       Before the Honorable Robert C. Jones
21  corporation, FREMONT               )
    INVESTMENT AND LOAN, a             )
22  foreign corporation, Does 1-5,     )
    Inclusive and Roes 1-V, inclusive, )
23                                     )
         Defendants.                   )
24                                     )
                                       )
25  _____)

26

27       Plaintiff, Denise Fuleihan, moves for an order vacating the court's order of

28  September 15, 2010 as follows. The basis of this motion is mistake, inadvertence

                                       1
              MOTION TO VACATE DISMISSAL

1   and surprise. In addition the motion is based on newly discovered evidence

2   consisting of an expert opinion concerning the standing of Wells to foreclose or to

3   appear further in the matter. This motion is based on FRCP 60(b).

4   I.      STATUS OF MATTERS IN SEPTEMBER, 2010.

5   1.      There were five matters set for hearing  before this Court on September 16,

6   2010. Those matters were Plaintiff's Motion to Modify the Preliminary Injunction,

7   Wells Fargo's Motion to Dismiss the First Amended Complaint, Fremont

8   Reorganizing Corporation's Motion to Dismiss the First Amended Complaint,

9   Fremont Reorganizing Corporation's 12 Motion to Strike Plaintiff's Improper

10  Sur-reply, and Wells Fargo's Motion to Strike Plaintiff's Improper Sur-reply.

11  2.      Also relevant to the matters being heard was the filing of a chapter 13

12  bankruptcy proceeding in the United States Bankruptcy Court for Nevada, case no.

13  09-25738. No motion to lift the automatic stay had been made in the Bankruptcy

14  Court as to the federal civil action as of the date of Judge Jones Order in

15  September, 2010. The bankruptcy proceeding was and is still active.

16  3.      As noted above, the Plaintiff had filed a second amended complaint which

17  was pending at the time of the court's action in September, 2010. No motion had

18  been filed to dismiss this complaint nor had to Court agreed that it could be filed.

19  4.      Plaintiff has received an expert opinion from a well know expert of

20  securitized mortgage trusts, named Neil Garfield. This opinion is dated November

21  14, 2010. A copy of this opinion is attached hereto as Exhibit A. Plaintiff did not

22  have this in time to submit the opinion to the Court in time for the hearing in

23  September, 2010. Such expert opinion constitutes new evidence and should be read

24  and considered by the court in passing on this motion.

25

26  //

27

28

MOTION TO VACATE DISMISSAL

1  II.     LAW PERMITTING SETTING ASIDE DISMISSALS UNDER FRCP

2          60(b).

3  5.      A motion to set aside a judgment on the grounds of mistake or newly

4  discovered evidence must be made within a reasonable time and not more than a

5  year after the order is entered. *Rule 60(b)(1-3). Brandon v. Chicago Board of Ed.*

6  *(7th Cir. 1988) 143 F.3d 293, 296.* This motion is made within the time limit.

7  6.      Besides the grounds set forth herein Plaintiff also moves to set aside the

8  order of the Court for lack of jurisdiction. Pursuant to *11 U.S.C. 362,* the filing of a

9  bankruptcy proceeding triggers the issuance of an automatic stay. The stay prevents

10 any action being taken against the Debtor without the consent of the Bankruptcy

11 Court. As noted herein and at prior hearings the Plaintiff made it clear that a

12 Bankruptcy Petition had been filed and was pending. No order lifting the stay had

13 been issued at the time of the hearing in September, 2010. Any action taken in this

14 action in violation of the automatic stay is void. *In re Schwartz (9th Cir. 1992) 954*

15 *F.2d 569.* There is no time limit on a motion based on lack of jurisdiction. *Rule*

16 *60(b)(4). Foster v. Arletti 3 Sarl (4th Cir. 2002) 278 F.3d 409, 414.* Thus, the

17 motion is proper and timely.

18

19 III.    ORDER OF JUDGE JONES IS VOID FOR LACK OF JURISDICTION.

20 7.      Judge Jones order of September 15, 2010 purported to dismiss Plaintiff's

21 first amended complaint. At the time the Plaintiff had filed a proposed second

22 amended complaint. There was no motion to dismiss her second amended

23 complaint. Whether Judge Jones made the correct decision in his ruling of

24 September 15, 2010 is not the issue. The issue is the jurisdiction of the Court to

25 consider and take any action that had an immediate and detrimental effect on the

26 Plaintiff and her property in light of the automatic stay then in effect. The ruling of

27 Judge Jones clearly impacts Plaintiffs rights. As the order violates the automatic

28 stay, the order is void.

IV.     NEWLY DISCOVERED EVIDENCE SHOWS THAT THE MOVING
           PARTIES LACKED STANDING TO MOVE FOR DISMISSAL.

8.      Attached to Plaintiff's declaration as Exhibit A, is an expert opinion of Mr.
Neil Garfield, LLB, who is a leading expert on consumers rights. As the Court is
well aware the path of Plaintiff's note and deed of trust was twisted and tortured.
Several of the original parties to her loan are out of business or bankrupt. Some of
those parties had entered into securitized trust agreements whereby Plaintiff's
obligation was the subject of an offering of mortgage backed securities. The loans,
including Plaintiff's, were to be held in a trust for the benefit of those securities
holders.

9.      The parties to these agreements had a many layered approach to funding the
trust. The purpose was to make it bankruptcy proof should any of those who
originated the loan or transferred it to the trust go out of business or become
bankrupt. The original lender, Fremont Financial, filed for bankruptcy a few years
ago. Its assets were sold to a successor entity that likewise went out of business.
Thereafter the trail of the note and trust deed become hard to trace as the parties
failed to follow their own procedures as dictated by their agreements. The parities
ignored  procedures of the uniform commercial code for the endorsement and
transfer of security instruments and the laws relating to their own bankruptcy and
reorganization. Wells Fargo, who was far down the chain, claimed it had the right
to foreclose on the Plaintiff's home, but has not been able to present proper
documentation to support its standing to foreclose. If it did not own the Plaintiff's
note it had no standing to foreclose. Further it did not have standing to appear and
move for dismissal of Plaintiff's action.

10.     Plaintiff requested Mr. Garfield to review the evidence that was available
and opine on the rights of Wells and others to foreclose or appear in this court in
opposition to Plaintiff's suit. In his review Mr. Garfield stated, "According to
information from Debtor, ("Plaintiff")Debtor has made unsuccessful attempts to

obtain from Movant("Wells and Fremont")and others the identity of the
Investor/Creditor and possession of documentation authenticating this identity.
Neither Affiant, Movant, nor the Court will be able to determine the identity of the
Creditor, if any still remains, until requests for information and documentation
have been complied with.

11.     According to the expert, "It is also my opinion that there is a very high
probability that all or part of the Debtor's Note was paid in whole or in part by third
parties, based upon industry practice, my personal review of hundreds of similar
transactions including the one at bar, and published reports. Until such time that the
identity of the Creditor, the document trail, and the precise money pertaining to
payments by third party sources is disclosed, neither Affiant, Movant, nor the Court
will be able to determine the amount of Debtor's equity in the Property. Debtor's
"Obligation" is the amount of money owed to the Creditor. The Obligation
originated with the advance of capital by Investors who purchased mortgage-
backed securities and ended with the promise to pay by the homeowner who is the
debtor in the transaction." See Exhibit A, page 14-15.

12.     Mr. Garfield continues: "It is also my opinion that many different parties in
the securitization chain came to express title or claim rights to enforce the DOT and
Note and that there was an intention to split the Note from the DOT, while
heretofore unusual in the marketplace was commonplace in securitization of
residential loans. The recorded encumbrance was never effectively or
constructively transferred because it was never executed in recordable form nor
was an effort made to create such a document by the parties to the instant case until
they decided to pursue foreclosure. All transfers or purported transfers of the Note
were not accompanied by the encumbrance being incident to said transfers because
the DOT interest as recorded remained in the name of the Originator, or that party
defined as the "Lender" in the Note and DOT." See Exhibit A, page 14-15.

1   13.    Mr. Garfield notes that applicable Arizona Deed of Trust statutes require that

2   every change of beneficiary interest in a DOT to real property is to be recorded.

3   Arizona recording statutes require that every change of beneficiary interest in a

4   DOT to real property to be recorded to be enforceable against a bone fide

5   purchaser for value without notice of a competing claim." Exhibit A, page 15.

6   14.    Based on his extensive experience and review of documents, Mr Garfield

7   stated: "Hence, it is my opinion, that the holder of the Note, either singular or

8   plural, were not the same parties as those who purportedly held the DOT at any

9   time pertinent to this case and that this was the result that was intended by the

10   mortgage Originator and the Participants in the securitization chain, since it was a

11   typical practice in the investment banking industry in their process of securitizing

12   loans throughout the period of 2001-2009." Exhibit A, p. 15.

13   15.    Mr. Garfield continued, "In my opinion, with a high degree of certainty, the

14   Debtor's title was and is subject to a cloud on title, a claim of unmarketable title

15   and possibly a title defect that cannot be cured without court order as a result of the

16   manner in which Debtor's loan was securitized. In all cases reviewed by

17   me, which include more than fifty securitization chains, the Prospectus and other

18   published documents clearly express that a securitized mortgage is treated

19   sometimes as being secured by real estate, and sometimes as not being secured by

20   real estate, depending on the context and purpose of the accounting. The naming of

21   a party other than the Investor as Beneficiary under the DOT as distinct from a

22   third party named as Payee on the promissory note and the same or other third party

23   named as Beneficiary under the policy of title insurance demonstrates an intent or

24   presumption or reasonable conclusion that there was intent by some or all of the

25   parties at various times in the steps of the securitization process to separate the

26   Note from the Deed of Trust, thus creating a cloud on title for both the owner of the

27   property and any party seeking to express or claim an interest in the real property

28   by virtue of the encumbrance." Exhibit A, p. 15.

1  16.    Mr. Garfield next discussed the different practices of those involved in the

2  securitization process. Examination of the accounting records of the entities that

3  were involved in the securitization process led him to comment as follows.

4  "Participants in the securitization scheme followed the rules, they did not post the

5  instant transaction as a loan receivable. The transaction most likely was posted on

6  their ledgers as fee income or profit which was later reported on their income

7  statement in combination with all other such transactions. These rules explain how

8  and why the transactions were posted on or off the books of the larger originating

9  entity. These entries adopted by said companies constitute admissions that the

10  transaction was not considered a loan receivable on its balance sheet, or on the

11  ledgers used to prepare the balance sheet, but rather shown on the income

12  statement as a fee for service as a conduit. These admissions in my opinion are fatal

13  to any assertion by any such party currently seeking to enforce mortgages in their

14  own name on their own behalf, including but not limited to the securitization

15  Participant in this case." Exhibit A p. 15-16.

16  17.    The impact of this opinion is significant. If the party seeking to foreclose and

17  take possession of Plaintiff's home never booked the note as a loan receivable their

18  interest in the loan is illusionary at best. This opinion by a well regarded expert

19  shows that the court erred in granting the defendant's motions to dismiss the

20  plaintiff's first amended complaint. This expert opinion shows that the assumptions

21  made by the court in granting the motions to dismiss were erroneous. Based on this

22  new evidence the dismissal should be vacated.

23  18.    In the most recent proceedings in the Bankruptcy Court the Judge there

24  indicated substantial doubt as to the standing of Wells and Fremont to foreclose.

25  This opinion demonstrates the folly of this court proceeding on a matter that is

26  strictly within the jurisdiction of the U.S. Bankruptcy Court.  It further show that

27  the ruling of Judge Jones on September 15, 2010 is likewise subject to substantial

28  doubt as Plaintiff advocated the defendant's lack of standing as a basis for her

1   claims set forth in her second amended complaint. It was error for Judge Jones to

2   deny review of the second amended complaint without even allowing a motion to

3   dismiss to which the plaintiff could have responded. Now, the new evidence of Mr.

4   Garfield shows that if Judge Jones had jurisdiction he would have been making the

5   wrong decision in granting the motions to dismiss.

6

7   V.      CONCLUSION.

8          The motion to vacate the dismissals should be reversed based on the

9   foregoing facts and law.

10

11

12   Respectfully submitted,

13

14

15   _____

16   Plaintiff, Denise Fuleihan

17

18

19   DECLARATION OF PLAINTIFF

20          I, Denise Fuleihan, declare.

21          I am the plaintiff herein. Attached hereto as Exhibit A is a true and correct

22   copy of the legal opinion of Neil Franklin Garfield, dated November 10, 2010.

23          I declare under penalty of perjury that the foregoing is true and correct.

24   Executed at Las Vegas, Nevada this 21st day of March, 2011.

25

26   _____

27   Denise Fuleihan

28

MOTION TO VACATE DISMISSAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT A

MOTION TO VACATE DISMISSAL

# EXHIBIT A

# EXHIBIT A

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| **IN RE:**<br>**Denise Fuleihan, Debtor** | Case #   BK-S-25738-BAM |
| **US Bank "trustee", Movant** | EXPERT DECLARATION OF NEIL F GARFIELD<br><br>Re: Real Property Located at 209 ROYAL ABERDEEN WAY, LAS VEGAS, NEVADA 89144 |
| | Chapter 13 |

STATE OF ARIZONA        )
                                )

COUNTY OF MARICOPA  )

Neil Franklin Garfield, Esq., deposes and states unsworn under penalty of perjury as follows:

"I am over the age of eighteen years and qualified to make this affidavit. I have no direct or indirect interest in the outcome of the case at Bar for which I am offering my observations, analysis, opinions and testimony. I have been a licensed member in good standing of the Florida Bar since May 31, 1977. I am a member of the Federal Trial Bar and a Member of Bankruptcy Bar. My Resume was filed by Debtor and is incorporated herein.

As an investment banker or investment banking consultant I have been active since the late 1960's is the use, sale, trading, hedging and issuance of derivative products, i.e., financial products whose value derived from something other than the instrument itself.

"My area of expertise, based upon knowledge, training and experience is in the field of securities, the securities industry, derivative securities, securities regulation, special purpose vehicles, structured investment vehicles, creation of trusts pooling agreements, issuance of asset backed securities and specifically mortgage backed securities by special purpose vehicles in which an entity is named as trustee for the holders of

1

certificates of mortgage backed securities, the economics of securitized residential mortgages, securitization of mortgage loans, accounting in the context of said securitizations and REMIC vehicles and pooling and servicing of securitized loans. I have been what might be referred to as a "Wall Street Insider" with contacts in investment banking, including intermediary conduits, underwriters of reissued securities that were sold to Investors (singular "Investor" also stands for the plural), in the form of mortgage-backed securities. I have knowledge, training and experience of various precursor asset protection strategies, including minimization of tax liability, which also are constructed to be made bankruptcy remote in commercial and real estate settings. I have knowledge, training and experience in loan origination, underwriting and the assignment and assumption of securitized residential mortgage loans. I also have legal knowledge, training and experience, including the areas of securities law, real property law, Internal Revenue Code law as applicable to REMICs and Uniform Commercial Code law. I also have knowledge, training and experience in the practices prevalent during the period of 2001-2010 that enabled the accumulation and availability of an overwhelming abundance of investment dollars, made possible because the derivatives sold to investors were made to appear that they contained both exceptional growth and zero risk, because the history of mortgage success up to that point in time had been high, and because these instruments were in addition made to appear undeniably and excessively guaranteed by 3rd party sources. I also have knowledge, training and experience that this abundance of funding was one of the direct and inevitable causes of violations against homeowners and purchasers pertaining to funding of mortgage loans for purchases and refinancing, including predatory lending practices and Truth in Lending Act violations.

I have also been on the advisory board and consultant to community banks. I was the author and editor of the SMARTBanks Fax Newsletter from 1996-1999, published daily by American Bank Card to the officers of several hundred community banks, providing information, business models, loan strategies, and advice on ATM and electronic funds transfer. I am also the creator of intellectual property consisting of computer programs and business models for sale, maintenance and growth of commercial customers for community banks.

I have been the attorney of record on hundreds of foreclosures in the State of Florida representing Banks on residential and commercial mortgages, and community association enforcing liens for assessments.

As the author of the update of Harrison Publications' Florida Real Property Law (1977) I have been considered an expert in title, lending practices, priority of mortgages, perfection of liens, and enforcement of obligations related to real estate for more than 30 years and have appeared as an expert in many state and Federal lawsuits relating to same.

"All factual testimony made by me is true and correct to the best of my knowledge and belief. All opinion testimony made by me is beyond a reasonable degree of probability in my area of expertise, which is set forth in the above paragraph and in my Resume. I

2

have no direct or indirect interest in the outcome of the case at Bar for which I am offering my observations, analysis, opinions and testimony.

As the attorney and consulting investment banker I have drafted, sold and managed dozens of pools used to fund loans, purchases of commercial and residential real estate, using layered (now known as laddered) bankruptcy remote vehicles that were derivatives as they are defined in the current markets, but were referred to as interests in limited partnerships when I created those instruments.

Granting the Motion to Lift Stay would be interpreted as this Court's finding that the MOVANT is qualified to foreclose and would prevail in a judicial foreclosure action. As a matter of practice this is how it is perceived by state judges and other parties. The effect on title of this property would be a cloud, probably a defective (probably fatal defect) on the title and would be contrary to the intent of the Nevada legislature when it passed real property laws and laws pertaining to title.

Based on prior experience with the Law Firm of Tiffany and Bosco, P.A. it is highly probable that some or all of the documents presented by Movant were both created and executed by employees of that firm.

The Movant is not a creditor and certainly not a secured creditor and therefore cannot submit a credit bid at auction. The Movant has no authority, standing or power to execute a satisfaction of mortgage, modification, short-sale, or reconveyance of the property or any encumbrance on the property. No independent title company will issue a new policy without exceptions for the securitization of the receivables on this obligation.

Based upon my involvement with these same parties and the LUMINAQ Reports, US Bank is not described as "Trustee" nor does it possess any powers reasonably expected of a "Trustee" pursuant to a Trust document describing the trustor, trustee, beneficiaries, terms and conditions. The securitization documents along with previous testimony in other cases, clearly show that the powers of a fiduciary are split between the Master Servicer (controlled by the underwriter) and the servicer. Based upon forensic research, no trust instrument exists for this "pool" and no assets were ever actually transferred to or into the pool as required by applicable securitization documents, applicable state and federal law, and as required by the Internal Revenue Code (REMIC).

The encumbrance shown in the public records in the county property records is an illusion. As an interloper, Movant may bid on any legally authorized exercise of a power of sale or foreclosure sale ordered by a final judicial judgment. The subject transaction consists of a securitization structure in which the securitization documents (in particular the pooling and servicing agreement) create the parameters of future transactions including first, the sale of mortgage-backed securities to investors, second fees and profits to participants in the securitization chain, third the purchase of insurance (including credit default swaps) and the creation of credit enhancement instruments.

3

The purpose of the subject transaction was to sell mortgage-backed securities and accumulate a pool of money, part of which would be used to fund mortgage loans in the future. The fourth element of the subject transaction is the funding of a "mortgage loan" from the above referenced cool of money. Therefore the creditor (s) are the investors who purchased the mortgage-backed securities. The debtor consists of a group of parties in the securitization chain. This group includes but is not limited to the borrower that executed mortgage documents at the time of the closing of the loan.

There are significant differences between the terms of the obligation undertaken by the Petitioner, the note that was intended to recite the terms and the Deed of Trust (mortgage) that was incident to the note. In addition there are significant differences between the evidence of liability received by the putative trust (which does not appear to have been legally constituted) and the terms expressed at the closing of the Petitioner. Hence, unlike conventional loans there are two conclusions that I reach, to wit: (1) While there are questions of fact that require resolution by a trier of fact within a court of competent jurisdiction, Movant possesses no colorable right to pursue enforcement of any obligation against the Petitioner as it is no way either a creditor nor the authorized representative of anyone claiming to be a creditor and (2) there is no possible scenario under which the obligation was secured by a perfected lien, thus foreclosing the availability to non-judicial sale of the subject property by any party. A party wishing to be established as a creditor would be required to file an action to reform the documentation and prove standing as a real party in interest, to wit: that it is either the source of funding, or paid consideration for a legal transfer of the entire loan (as opposed to merely the receivables) or that it is the authorized representative for a disclosed creditor.

None of the documents reviewed and which are tendered in evidence by the Petitioner or the Movant reveal anything other than self-serving declarations of authority for what is now an entirely a defunct entity that was used as a stand-in (nominee) at the closing with Petitioner. While the Movant has submitted documentation, none of it shows a complete unbroken chain signed by authorized persons for authorized entities. Further there are several documents that were clearly "robo-signed" in which neither the signatory nor anyone else appearing on the document had any knowledge of the transaction.

The funds wired to the escrow agent for funding of the loan came from a third party, which meets the exact definition of prohibited table-funded loans under the Truth in Lending Act and Regulation Z from the Federal Reserve. Hence while Fremont may be on record as Lender in the county records, no funds were advanced or even passed through the hands of Fremont. Hence no money is owed to Fremont nor was any obligation ever created wherein the Petitioner borrowed and received funding from Fremont and owed Fremont money. Thus Fremont was named on the note when it was not the creditor and Fremont and MERS was shown on the Deed of Trust when neither of them was possessed (and in fact disclaimed) at any and all times a financial interest in the subject loan. The obligation therefore is owed by Petitioner to parties unnamed and undisclosed despite due diligence by Petitioner to determine the identity of the

4

obligee. In any event since both the note and mortgage are fatally defective in failing to describe the proper terms and parties (being at variance with the facts and the terms of the mortgage bond received by the source of funding), obligation exists but is unsecured, with no effort by Movant to perfect the lien or reform the documents.

The current status is that there is an obligation to an unidentified creditor that is unsecured.

The closing of the loan transaction with the borrower created an obligation in which the borrower was to be the payor and in which the investors were to be the ultimate payee. Unlike conventional loans before the era of securitization the evidence of the obligation consists of the promissory note executed by the borrower PLUS all of the securitization documentation eventually resulting in the issuance of a "bond" payable to the investor based upon the presumed receipt of a flow of funds generated by mortgage payments, of which the debtor in the instant bankruptcy proceedings, was one such source. The bond is rarely well-documented and usually consists of bookkeeping entries that should be consistent with the terms of the prospectus that the investor received prior to the advance of funds for the so-called mortgage-backed security.

Hence the promissory note executed by the borrower was evidence of only a portion of the obligation that arose in two steps, to wit:  first, the obligation to repay the investment advanced by each investor (the ***bond*** being the evidence of that obligation) and second, the included obligation of the borrower (the promissory ***note*** being the evidence of that obligation). The owner of the bond is therefore the owner of the obligation from the borrower, along with all the co-obligors that joined in the obligation constituting the bond. Movant is not the owner of the bond, not the payee on the note, not the holder and owner of the note nor the obligee under the obligation of the Petitioner, whether documented or not. No money is owed under any document or set of facts to the Movant. Hence no colorable right to foreclose or exercise a right to sell, nor categorization as payee, beneficiary or otherwise exists. The presence of Societe Generale, the underwriter based in France, strongly indicates that the investors (pension funds etc.) were foreign entities. My prior experience with the parties involved in this transaction indicates that the majority of the investors were based Germany and Southeast Asia. My prior experience with these parties indicates a high probability that this trust was dissolved or reformed, repackaged and sold as part of another pool, the trustee for which is not US Bank (another question of fact for the trier of fact).

The borrowers' duties are set forth in the promissory note and deed of trust (mortgage). The creditor's rights, and in particular the Movant, since they are not the lender of record derive strictly from the enabling documents for the alleged securitization structure. Since the participants in the securitization failed to adhere to the restrictions, terms and conditions of pooling of assets, the ***loan*** never moved, although the money did as a result of tacit and explicit agreements amongst participants in the securitization chain.

5

This declaration presumes that neither the identity of the investors nor the securitization documents were disclosed to the borrower. It further presumes that neither the identity of the borrower nor the Loan" documents were disclosed to the investor. As an expert with superior knowledge of the securities industry, it is my opinion and presumption that this was the standard method of operations in the sale of mortgage backed securities and the funding of loans.

While the PSA sets forth the conditions for assignment of a loan into a pool that would be structured to sell portions into different levels of tranches within an entity typically referred to as a special purpose vehicle or "Trust" (without the formal creation of a trust), such assignments are rarely seen until a particular loan is the subject of litigation and an actual hearing is scheduled wherein evidence will be tendered to the court. All other loans, with few exceptions, are not assigned, indorsed or delivered to any assignee. This is readily corroborated by the hundreds of loans that were not yet in litigation wherein the parties seeking to enforce the obligation could not show even a copy of any such documentation. In many of those cases, the parties seeking to enforce were the same as in the instant case.

Thus it is apparent that the Movant has established a pattern of conduct, contrary to the representations made in court, in which documentation of assignment, indorsement and delivery is fabricated and often forged strictly for the purpose of litigation. Often the "original" note with an indorsement comes to court dressed as the original but upon examination consists of a color printer fabrication. The securitization documents do not allow such an assignment for many reasons, among which are the pool does not allow for an assignment of a non-performing loan, and the pool has a cutoff date, which has long passed.

Therefore it is pure speculation as to who controls or owns the loan except that legally, from the property records, only the loan originator has legal title. This can only be resolved by a quiet title action in which the Court declares the rights of the parties.

However, since the instant mortgage transaction was a table funded loan, the originator's bare legal title leaves it without any claim for default, deficiency or loss since it did not fund the loan in the first instance or at any time thereafter. The party with standing is the party who has a legitimate claim to payment. None of the parties before the court have a legitimate claim to payment. None of them could prevail in a judicial foreclosure.

And, as in all such cases, none of them are willing to offer or allow inquiry into a full accounting for the obligation due to the investor, as that would open up the issue as to whether the investor had already been paid through insurance and credit enhancements, (which is often the case) and whether the loan itself was now part of another package of securities that were created after the current vehicle was privately dissolved. If the investor was paid, the entire obligation owed to the investor has been extinguished thus satisfying the terms of the "bond" which in turn satisfies any

expectancy of the investor from the borrower who signed the promissory note. The fact that the intermediaries who either have the note or who have destroyed the note, takes nothing away from the duty to return the note as paid --- unless, the parties that paid the investor did so with rights of subrogation.

In no case (out of hundreds examined by me) have I ever seen any insurance (from AIG, AMBAC etc.) ever contained a subrogation clause. In fact, quite the contrary, as was revealed recently in the release of documentation concerning the Federal bailout, the terms of payments were that the insurer or counter party on the credit default swap specifically waive such a claim.

Although politically unpopular, the fact remains that the intermediary participants in the securitization were paid excessive fees and profits and they often redirected the payment due to the investor into their own pockets or an affiliate. The same is being done with the foreclosures where upon sale of the house, the title or proceeds are neither reported nor sent to the investor. The fact that agents of the investor received these vast sums far in excess of any obligation is not a reason to sustain a mistaken claim against the borrower. The obligation is satisfied by payment, and the misbehavior of entities having bare possession of some documentation is not a reason to give these would-be foreclosers a free house.

A decision in favor of the would-be forecloser based upon a "colorable" claim skips the vital ingredient of standing. As Katherine Porter states in one of her many studies on the subject as an adjunct professor of law at Harvard, the allegation that the borrower must be liable for something is not a proper substitute for alleging and proving that the liability in fact exists and that it is owed to the Movant.

The fact that the borrower has not made a payment is not necessarily evidence of a default. The claim of non-payment against the borrower must be backed up by a claim that such payments were in fact due. This is only an assertion that can be made by the actual creditor since the securitization documentation provides for multiple channels of repayment. This is a claim that cannot be made as an honest representation to the court. In every case in which I was an expert or observer, when the Court examined the documentation, the disparities between what was on them and what was required forced the Court to accept the reality that many, if not most of the foreclosures that have been rubber stamped, should have been stopped.

I evaluated the materials listed below, among other materials, facts and data in basing my opinions and inferences. Each of these documents and other materials, facts and data are of the type that experts in my field would customarily rely upon in forming opinions and inferences. The information sources I reviewed were sufficient for me to testify as to the facts and opinions that are included herein. Where additional information is required to make other factual statements and express opinions on further subject matter, I have so stated. To the extent that information was presented to me by way of the forensic review and analysis performed by LUMINAQ, I have confirmed the

information through my review of the loan closing documentation. I also performed independent internet searches as to Securitization Documents available to the public online. Most of the testimony in this Declaration was plainly clear from review of the below listed materials, but to the extent that technical or specialized principles and methods were required, they have been reliably applied:

A.      The closing loan documents relating to the loan transactions that are the subject of this lawsuit. Not attached, because too voluminous, and those that are relevant to this proceeding have already been filed of record with the Court.

B.      The factual results of a Title and Securitization Review and Analysis performed by LUMINAQ, **which has been submitted by Petitioner.**.

C.      The Qualified Written Request ("QWR"). Since the QWR asks for answers to questions that would be required in the pleading and proof of a judicial foreclosure action, a response to the QWR should be prompt, require no research if the property is already declared in default, and is condition precedent to any action, judicial or non-judicial to foreclose or sell the property or enforce the obligation or note.

D.      The Responses are attached without their exhibits, such as they were, have been submitted by Petitioner.

E.      I have reviewed the correspondence and pleadings and other filings in this proceeding thus far.

D.      Various Bankruptcy Court pleadings and the Proof of Claim, which are of record.

F.      The MERS Min Summary and Milestone History, were unavailable though repeatedly requested. Movant failed to produce the MERS Min Summary and Milestone History, which would have taken Movant approximately 3 minutes to obtain online. I am positive that a full investigation of these reports would contradict and further show to be false evidence presented by Movant and of the position Movant appears to be taking in this case. I am also certain that Movant is aware of this.

"I use the following definition of "Creditor" taken from research in cases, the Bankruptcy Code and the Uniform Commercial Code. A "Creditor" is a legal entity that has advanced funds, goods or services in consideration of the right to payment, or has purchased the right to be paid. In the bankruptcy context, a "Creditor" is an entity that had a Claim against Debtor before the case was filed. 11 U.S.C. § 101(10). A "Claim" is a right to payment. § 101(5). Only a Creditor may file a Proof of Claim. § 501(a). The "Official Form 10 reflects this requirement by describing the 'Name of Creditor' as 'the person or other entity to whom the debtor owes money or property." In the context of securitized residential mortgages (including the one in the instant case), a "Creditor" is a legal entity or group of entities or persons under the law who have advanced money for the funding of mortgage loans and who are owed money from those mortgage loans. The creditor in the case at bar can be generically described as an Investor, as defined under the rules and regulations of the Securities and Exchange Commission who has paid money to an intermediary in a chain of securitization that resulted in the funding of one or more residential loan transactions; the promise to pay is from an entity usually referred to as a Special Purpose Vehicle (SPV) which is frequently erroneously referred to as a "Trust" with a "Trustee. The creditor/investor receives an instrument which is generically referred to as a Mortgage Backed Asset Certificate ("Certificate"). The

Certificate incorporates terms by which the promise to pay interest and principal is made by the issuing SPV. The promise to pay is conditioned upon several terms, including but not limited to the performance of a pool of loans, the obligations of third parties, and impliedly the receipt of insurance proceeds triggered by partial non-performance of the pool of assets allocated to the SPV. In turn the SPV pool is carved out of other pools created by Aggregators employed by investment banking firms. The Aggregators are parties to Pooling and Service Agreements and Assignment and Assumption Agreements, which are Securitization documents that predate the funding of the loans in any of the Pools. The Certificate issued to the Investor conveys a percentage interest in the Pool of assets that is allocated to the SPV. To the extent the information in this paragraph was phrased in generalities, they were applicable to the specifics in this case.

"I was asked to render an opinion as to the factual basis pertinent to the issue of Standing. As relates to Constitutional Standing, my opinion is premised on the following definition: Constitutional standing under Article III requires, at a minimum, that a party must have suffered some actual or threatened injury as a result of the defendant's conduct, that the injury be traced to the challenged action, and that it is likely to be redressed by a favorable decision.  Valley Forge Christian Coll. v. Am. United for Separation of Church and State, 454 U.S. 464, 472 (1982); United Food & Commercial Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 551 (1996). My presumption, in the context of the question posed to me, is that standing requires that a party will suffer financial loss derived from non-performance (i.e., nonpayment) of the subject contract, which in this case is the obligation that arose when the subject loan was funded on behalf of the debtor as homeowner and referred to in some documents as the Borrower. Since the funding occurred out of a pool of money received by the investment banker from the investors, the investors are the creditors. By way of indenture (usually incorporating a prospectus) the investors agreed to an operating plan that defined the functions of the conduit which was used to funnel funds to the investor from the pool. This operating plan is loosely and erroneously referred to as a "Trust". However, since no assets remain in the conduit which is defined under the Internal Revenue Code as a REMIC (Real Estate Mortgage Investment Conduit). The REMIC is referred to in the world of finance as an SPV (Special Purpose Vehicle). Having been a practicing tax attorney and receiving my M.B.A. in accounting and taxation, and having reviewed the relevant provisions of the Internal Revenue Code, I presume the words "conduit" and "vehicle" convey the fact that no actual business events of taxable or monetary significance takes place in the REMIC. I conclude that this corroborates my opinion that the investors are the creditors, having been the only parties to advance funds from which the subject loan was funded.

The note signed by said borrower and the mortgage-backed bond accepted by the investor who purchased said security are both partial evidence of the obligation. The Deed of Trust is intended to be incident to the note and possibly incident to the bond, if the chain of title was perfected. The Payee on the note and the payee on the bond are different parties. The bonds were issued with three principal indentures: (1) repayment of principal non-recourse based upon the payments by obligors under the terms of

9

notes and mortgages in the pool (2) payment of interest under the same conditions and (3) the conveyance of a percentage ownership in the pool of loans, which means that collectively 100% of the investors own 100% of the entire pool of loans. This means that the "Trust" does NOT own the pool nor the loans in the pool. It means that the "Trust" is merely an operating agreement through which the investors may act collectively under certain conditions. Accordingly, it is my opinion that the parties with standing in relation to a securitized loan are the debtor/borrowers and the creditor/investors. This would be further corroborated if, as a matter of fact, the investment banker followed industry standard of selling the mortgage backed security FORWARD. "Selling forward" means that the security was sold and the money was collected before the first loan was funded on behalf of borrowers. However, even if the investment banker had not closed the sale of the securities with investors before accepting applications for loans, it would have been on the basis of an expectation of said funding. Ultimately, in all securitized loans there is really only one transaction --- a loan from the investors to the homeowner. Without an investor there would be no loan; conversely without a borrower there would be no investor or investment.

"It is accordingly my opinion that none of the above parties are or ever were creditors and that they therefore lack standing as defined above. None of said parties had or will at any time relevant to the subject matter before this Court suffered any actual or threatened injury as a result of the Debtor's non-payment of monthly payments pursuant to the original terms of the Note, nor because of her alleged default thereon, nor can any actual or threatened injury be traced to any other proceedings in bankruptcy court, including but not limited to the motion for relief from stay proceedings,  any action involving a Proof of Claim, the Chapter 13 Plan or otherwise, and therefore there never was any legitimate redress available to any of these parties by a favorable decision. Although specifically, ComUnity, named as "Lender" in the Note and Deed of Trust, or the co-venturers, including the title agent and escrow agent shown in the closing documents may have at least held physical possession of the Note issued to it by Debtor, it did not and does not have the right to enforce the Note.

"The evidence in the Court's record that is contrary to this opinion appears to constitute an intentional attempt to misleadingly make it appear that MOVANT was the holder of the Note, and that MERS could contend that it could act through its Nominal Beneficiary status on behalf of Fremont. Additionally, it is my opinion based upon a high likelihood and a high degree of confidence (having seen similar events with these parties) that the indorsements on the Note are fabricated.

Accordingly, it was impossible for any of Movant's evidence to be legitimate, pursuant to the legal and contractual requirements in the herein described Securitization Documents of the above referenced Trust.

"Accordingly it is my opinion that, pursuant to the above definition, that MOVANT has failed to provide any credible evidence of Constitutional Standing to invoke the subject matter jurisdiction of the Bankruptcy Court in this case to file the MLS nor to have the Proof of Claim. *In re Foreclosure Cases*, 521 F.Supp.2d 650 (S.D. Ohio, 2007); *In re*

10

*Kang Jin Hwang*, 396 B.R. 757, 764 (Bankr.C.D.Cal., 2008); *In re Jacobson*, 402 B.R. 359 (Bankr. W.D.Wash., 2009).

"As relates to the issue of Real Party in Interest, my opinion is that none of the parties mentioned above is a real party in interest in any sense of the word.

"None of the known Participants in the subject securitization chain has suffered any financial loss relating to the loan, nor are they threatened with any future loss even if foreclosure never occurs.  None of the known securitization Participants has ever been the real party in interest as a lender or financial institution underwriting a loan while funding same with respect to the loan.  None of the known securitization Participants, will suffer any monetary loss through non performance of the loan.  All of the known securitization Participants received fees and profits relating to the loans most of which were undisclosed to the borrower and to the lender (investor(s)).  The existence and identity of the real parties in interest was withheld from the Borrowers/Plaintiffs in the closing and servicing of the loan, and since all of the known securitization Participants fail to meet one or more of the following two tests required for HDC status: 1) without actual knowledge of defects; and/or 2) in good faith, meaning a legitimate belief that the loan was solid, based upon the information they had at the time of purchase of the Note.

"In terms of the real estate portion of the transaction, the homeowner was the Borrower and the Investor was the actual Creditor.  The investor is still the Creditor if the investor has not sold, transferred or alienated the hybrid mortgage backed security and if the investor has not been directly or indirectly paid through credit default swaps, with or without subrogation, or paid through a federal program with or without subrogation. Since no such instruments appear on record, any right of subrogation would appear to be equitable. Thus for purposes of this declaration, the unknown and undisclosed Investors constitute the only Creditor presumed to exist until the undersigned is presented with contrary evidence of the type that an expert in my field of expertise would normally take into account in forming opinions and conclusions.

Therefore I conclude that if there remain any Creditors, pursuant to the Note, they are the unidentified Investors and all other parties are intermediary or representative or disinterested.  Debtor has made unsuccessful attempts to obtain from Movant and others the identity of the Investors, the documentation authenticating their identity, and an accounting that would show all money paid or received in connection with the subject obligation. Neither Affiant, nor Movant, nor the Court will be able to determine amount of Debtor's equity in the property until a complete accounting of all debits and credits, including but not limited to, the 3rd party payments referred to above. Until such time as requests for said information have been answered, I will be unable to identify with certainty the exact identity of the current creditor, meaning the true owner of the alleged obligation, other than to say that it is not Movant, nor any Participant in the Securitization chain.

"Several transactions have purportedly taken place regarding the subject loan, as the

11

Note was transferred up the chain of securitization to the Trustee of the MBS Pool. In my opinion, the "Lender," as set forth in the original DOT, or ComUnity in this case, in securitized loans is at best only a nominee for an undisclosed principal. The transaction with the homeowner was subject to a pre-existing contractual relationship wherein the Investors advanced the funding for the loan and profits, fees, expenses, rebates, and kickbacks. This is known to many of the known and unknown securitization Participants, inasmuch as they have been the recipients of memoranda from legal counsel and advisers, which in my opinion are not protected by attorney client privilege or the attorney work product privilege, in which they have been informed that it is only a "Nominee" when the "Lender" does not advance cash for funding the loan and does not receive any payments on the obligation.

A situation has been created which at least theoretically would allow multiple parties to make claims on the same property from the same borrower, claiming the same Note and DOT as the basis therefore. The intended monetary effect of the use of such a Nominee was to provide obfuscation of profits and fees that were disclosed neither to the Investor who put up the money nor to the Borrower in this loan. In the case at bar, it is my opinion based upon a reasonable degree of financial analytical certainty, that the total fees and profits generated were actually in excess of the principal stated on the note which is to say that Investors unknowingly placed money at risk the amount of which vastly exceeded the funding on the loan to the borrower. The only way this could be accomplished was by preventing both the Borrower and the Investor from accessing the true information, which is why the industry practice of Nominees like the private MERS system were created. Even where MERS is not specifically named in the originating documents presented to the homeowner at the "closing" it was industry practice from 2001-2008 to utilize MERS "services", or to implement practices similar to those utilized by MERS. Therefore it is not possible nor probable that the data from the closing was entered into the MERS electronic registry based on an assignment that was executed by the originator.

As a general rule in securitized transactions and especially where MERS is named as Nominee, documents of transfer (assignments, endorsements, etc.) are created and executed contemporaneously with the notice of default (years after the cutoff date required by the IRC REMIC codes and years after the restrictive cutoff in the securitization documents --- thus selecting a Participant in or outside the securitization chain to be the party who initiates collection and foreclosure.  The very practice of having a secret system of recording transfers of beneficial ownership of real estate notes, ipso facto creates an automatic cloud upon title. The attempt to transfer the loan after the express cutoff date required by the Internal Revenue Code (REMIC) and the express conditions of the securitization documents, as well as the attempt to transfer a non-performing loan into the pool violates numerous restrictions in the documents which Movant relies upon to demonstrate its authority to act, although the Movant has not actually submitted same and that burden was improperly placed on the Petitioner.

"In my opinion, it is unlikely that any HDC exists, because of the way securitization was universally practiced within the investment banking community during 2001 through

2010. Hence the loan product sold to the subject homeowner included a Promissory Note that was evidence of a real obligation that arose when the transaction was funded but lost its negotiability in the securitization process, which thus bars anyone from successfully claiming HDC status.   This leaves the real parties in interest, once identified, to assert equitable claims or equitable subrogation claims for third party payments. The negotiability of the note was negatively affected by (1) the splitting of the note and mortgage as described herein; (2) by the addition of terms, conditions, third party obligors and undisclosed profits, fees, kickbacks all contrary to existing federal and state applicable statutes and common law (which has relevance to the TILA, RESPA and related allegations in the LUMINAQ Analysis;  and (3) knowledge of title and chain of title defects in the ownership of the Note, beneficial interest in the encumbrance, and position as Obligee on the obligation originally undertaken by the subject homeowner.

"The only party that can claim to be a Holder in Due Course ("HDC") of the Note are those that paid value for the Note, without knowledge that there were any pending challenges to its validity and who fulfill the other requirements for HDC status. This HDC and the Third Party Sources are the only ones that could conceivably suffer a monetary or pecuniary loss resulting from non-payment of the obligation. The Investor could lose if because they advanced the actual funds from which the Financial Product Loan was funded, assuming these Investors that purchased asset backed securities were those in which ownership of the Loans were described with sufficient specificity as to at least express the intent to convey ownership of the obligation as evidenced by the Promissory Note and an interest in real property consisting of a security interest held by an entity that was described as the Beneficiary of a Trust created by an instrument entitled "Deed of Trust." These Investors were not named. This practice has been intentional, in my opinion, based on the overwhelming commonality of this reoccurring obvious failure, and other overwhelming evidence. The Third Party Sources that could conceivably lose because they would have paid value prior to default or notice of default, and fall within one or more of the following classifications:

a) Insurers that paid some party on behalf of said investors;

b) Counterparties on credit default swaps;

c) Conveyances or constructive trusts arising by operation of law through cross collateralization and over collateralization within the aggregate asset pools or later within the Special Purpose Vehicle tranches;[1]

d) The United States Treasury Department through the Troubled Assets Relief Program in which approximately $600 billion of $700 billion has been authorized and paid to purchase or pay the obligation on "troubled" (non performing) assets of the LOANS are part of the class of assets targeted by TARP;

e) The United States Federal Reserve, which has extended credit on said troubled assets and has exercised options to purchase said troubled assets;

---

[1]  "Tranches" is an industry term of art referring to the types of division within a Special Purpose Vehicle.  They are described in the Securitization Documents reviewed and on file.

f) Any other party that has traded in mortgage backed securities from the aggregated pools or securitized tranches containing interests in the Notes.

"In my opinion, based on evaluation and review of a multitude of Mortgage Backed Securities documentation, financial documentation, from knowledge of the gains that can be made by various Participants from various triggers, and from investigations performed, and the consistency with which the same situation, with the same problems is seen to exist in nearly every example, it is reasonable to conclude that the creation of an untenable situation for Investors in these transactions, or the appearance of an untenable situation for Investors, is that paradoxically said situations have been intentionally created.

"The loan made to Debtor was part of a two way transaction in which the two parties at each end thereof each purchased a "Financial Product." On one end, the home buyer or refinancer was "sold" a residential home loan. On the other side, a Mortgage Bond was sold to an Investor. In my opinion, both financial products were securities. Neither set of securities were properly registered or regulated, and the information that would reveal the identity of the "Lender" is in the sole care, custody and control of the Loan Servicer or another Intermediary conduit in the Securitization Chain, including but not limited to the Trustee or Depositor for the Special Purpose Vehicle that re-issued the homeowner's Note and encumbrance as a Derivative Hybrid Debt Instrument (bond) and equity instrument (ownership of percentage share of a pool of assets, of which the subject loan was one such asset in said pool). Said Security, the Bond, that was sold to an Investor was done by use of the Borrower's identity and obligation without permission. In my opinion, it is equally probable that the Investors were kept unaware that a maximum of only 2/3 of their investment was actually going to fund Debtor's loan and others similarly situated, with the excess being used to create instant income for Participants. Debtor was unaware that such large profits or premiums were being generated by virtue of his identity and signature on the purported loan documents.

"According to information from Debtor, Debtor has made unsuccessful attempts to obtain from Movant and others the identity of the Investor/Creditor and possession of documentation authenticating this identity. Neither Affiant, Movant, nor the Court will be able to determine the identity of the Creditor, if any still remains, until requests for information and documentation have been complied with.

"It is also my opinion that there is a very high probability that all or part of the Debtor's Note was paid in whole or in part by third parties, based upon industry practice, my personal review of hundreds of similar transactions including the one at bar, and published reports. Until such time that the identity of the Creditor, the document trail, and the precise money pertaining to payments by third party sources is disclosed, neither Affiant, Movant, nor the Court will be able to determine the amount of Debtor's equity in the Property. Debtor's "Obligation" is the amount of money owed to the Creditor. The Obligation originated with the advance of capital by Investors who purchased mortgage-backed securities and ended with the promise to pay by the

homeowner who is the debtor in the transaction.

 "It is also my opinion that many different parties in the securitization chain came to express title or claim rights to enforce the DOT and Note and that there was an intention to split the Note from the DOT, while heretofore unusual in the marketplace was commonplace in securitization of residential loans. The recorded encumbrance was never effectively or constructively transferred because it was never executed in recordable form nor was an effort made to create such a document by the parties to the instant case until they decided to pursue foreclosure. All transfers or purported transfers of the Note were not accompanied by the encumbrance being incident to said transfers because the DOT interest as recorded remained in the name of the Originator, or that party defined as the "Lender" in the Note and DOT. Applicable Arizona Deed of Trust statutes require that every change of beneficiary interest in a DOT to real property to be recorded. And Arizona recording statutes require that every change of beneficiary interest in a DOT to real property to be recorded to be enforceable against a bone fide purchaser for value without notice of a competing claim. Hence, it is my opinion, that the holder of the Note, either singular or plural, were not the same parties as those who purportedly held the DOT at any time pertinent to this case and that this was the result that was intended by the mortgage Originator and the Participants in the securitization chain, since it was a typical practice in the investment banking industry in their process of securitizing loans throughout the period of 2001-2009. In my opinion, with a high degree of certainty, the Debtor's title was and is subject to a cloud on title, a claim of unmarketable title and possibly a title defect that cannot be cured without court order as a result of the manner in which Debtor's loan was securitized. In all cases reviewed by me, which include more than fifty securitization chains, the Prospectus and other published documents clearly express that a securitized mortgage is treated sometimes as being secured by real estate, and sometimes as not being secured by real estate, depending on the context and purpose of the accounting. The naming of a party other than the Investor as Beneficiary under the DOT as distinct from a third party named as Payee on the promissory note and the same or other third party named as Beneficiary under the policy of title insurance demonstrates an intent or presumption or reasonable conclusion that there was intent by some or all of the parties at various times in the steps of the securitization process to separate the Note from the Deed of Trust, thus creating a cloud on title for both the owner of the property and any party seeking to express or claim an interest in the real property by virtue of the encumbrance.

"I have also reviewed, for the past 40 years, published Financial Accounting Standards obviously intended for auditors involved in auditing and rendering opinions on the financial statements of entities involved in securitization, securities issuance and securities sale and trading. If the known Participants in the securitization scheme followed the rules, they did not post the instant transaction as a loan receivable. The transaction most likely was posted on their ledgers as fee income or profit which was later reported on their income statement in combination with all other such transactions. These rules explain how and why the transactions were posted on or off the books of the larger originating entity. These entries adopted by said companies constitute admissions that the transaction was not considered a loan receivable on its balance

15

sheet, or on the ledgers used to prepare the balance sheet, but rather shown on the income statement as a fee for service as a conduit. These admissions in my opinion are fatal to any assertion by any such party currently seeking to enforce mortgages in their own name on their own behalf, including but not limited to the securitization Participant in this case.

"This concludes this Unsworn Declaration, made under penalty of perjury."

Signed on November 14, 2010.


/s/ *Neil F Garfield, Esq*

Neil Franklin Garfield, Esq.
FBN 229318

16

1

## PROOF OF SERVICE

2          I am employed in the County of Clark, State of Nevada.  I am over the age of

3    eighteen (18) years and am not a party to the within action.  My business address is

4    209 Royal Aberdeen Way, Las Vegas, NV 89144.  On   March 23, 2011, I caused

5    the following document described as: MOTION TO VACATE RULING DATED

6    SEPTEMBER 15, 2010 DECLARATION AND POINTS AND AUTHORITIES IN

7    SUPPORT FRCP 60(b)  to be served on the parties who have appeared in the

8    above-captioned lawsuit.  I place a true and correct copy of such document in a

9    sealed envelope addressed to the following:

10   Snell & Wilmer, LLP                              Jones Vargas
     3883 Howard Hughes Parkway           3773 Howard Hughes Parkway
11   Suite 1100                                          Third Floor South
     Las Vegas, NV 89169                          Las Vegas, NV 89169
12

13   _X __ (BY U.S. MAIL) I deposited such pre-paid postage envelope at Las Vegas,

14   Nevada.  I am familiar with the office's practice of collection and processing

15   correspondence for mailing.  Under that practice, it would be deposited with the

16   U.S. Postal Service on that same day with postage prepaid at Las Vegas Nevada in

17   the ordinary course of business.

18   _X ___ (STATE) I declare under penalty of perjury under the laws of the State of

19   Nevada that the foregoing is true and correct. Executed this 23rd day of March,

20   2011, at Las Vegas, Nevada.

21

22   _____

23

24

25

26

27

28

MOTION TO VACATE DISMISSAL